UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                            :

GREGORY MESSER, as Trustee for the      :
Estate of JOSEPHINE CHAPPLE,         :
                            :

          Plaintiff,            :     **MEMORANDUM AND ORDER**
                            :

        - against -           :     1:03-cv-04989-ENV-JMA
                            :

FAHNESTOCK & CO. INC.,          :
ROBERT PELHAM, and ERIC SHAMES,   :
                            :

         Defendants.         :
                            :
------------------------------------------------------------------X

**VITALIANO, D.J.**

Josephine Chapple[1] brings this employment discrimination action against defendants

Fahnestock & Co. Inc., n/k/a Oppenheimer & Co. Inc. ("Fahnestock" or the "company"), Robert

Pelham, and Eric Shames, alleging violations of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the New York State Human Rights Law,

N.Y. EXEC. LAW § 290 *et seq.* ("NYSHRL"). Chapple, who is female, alleges that the

defendants discriminated against her on the basis of her sex by (1) subjecting her to a hostile

work environment; (2) demoting and harassing her in retaliation for her complaints concerning

the discriminatory treatment to which she was subjected; and (3) terminating her in retaliation for

her refusal to submit to defendants' unwelcome sexual advances.

Before the Court are three motions. Defendants seek, pursuant to Federal Rule of Civil

Procedure 56, partial summary judgment as to plaintiff's claims against defendant Shames.

---

[1]     Chapple filed for bankruptcy under Chapter 7 in June 2004. Upon a motion by Gregory Messer, the
bankruptcy trustee for Chapple's estate, the Court ordered that he be substituted for Chapple as the plaintiff in this
action. *See* December 29, 2006 Order Granting Motion to Substitute Party, Docket Entry No. 68. However, in order
to avoid confusion, the Court will refer to Chapple as "plaintiff" throughout this decision.

Plaintiff not only opposes defendants' motion but also cross-moves for sanctions and costs, under FED. R. CIV. P. 11 and 28 U.S.C. § 1927, as a result of its filing. Finally, plaintiff cross-moves under FED. R. CIV. P. 15(c) for leave to amend her complaint to add several "clarify[ing]" allegations, claims under the New York City Human Rights Law, N.Y.C. ADMIN. CODE § 8-101 *et seq.* ("NYCHRL"), and a fourth defendant, Fahnestock Chief Executive Officer Albert Lowenthal. For the reasons set forth below, defendants' motion for partial summary judgment is denied, plaintiff's motion for sanctions and costs is denied, and plaintiff's motion for leave to amend the complaint is granted in part and denied in part.

## I.  BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 Statements, including attached exhibits, and are construed, as they must be, in the light most favorable to Chapple, the nonmoving party. See Capobianco v. City of New York, 422 F.3d 47, 54-55 (2d Cir. 2005).

Fahnestock is a "full service securities broker-dealer with offices located throughout the United States." (Pl.'s Ex. 4 at 2.) Chapple was hired as a sales assistant on October 22, 2001 and assigned to the Fahnestock branch office located at 125 Broad Street in Lower Manhattan. For approximately the first five months of her employment, Chapple reported to Robert Pelham, the branch manager. Chapple asserts that Pelham sexually harassed her and discriminated against her beginning at some point during this time period and continuing after it. Defendants concede that there exist genuine issues of material fact concerning Pelham's conduct towards Chapple and consequently do not move for summary judgment on the claims against him.[2]

---

[2]  The Court recites the background facts concerning the interactions between Chapple and Pelham, construed in the light most favorable to the plaintiff, to the extent they are relevant to defendants' instant motion for partial summary judgment in favor of defendant Shames and plaintiff's cross motions for sanctions and costs and for leave to amend the complaint.

At the start, Chapple describes several examples of Pelham's allegedly harassing behavior. First, Chapple asserts that, in late October 2001, as she was walking to her desk Pelham made a comment concerning her breasts that was audible to her and several coworkers. According to Chapple, Pelham stated, "[o]h, you always know when Josephine's coming. Her chest is always right in front of her." (Chapple Dep. Tr. at 119:13-16.) Pelham and another coworker then began laughing in Chapple's presence, and Chapple told Pelham to "watch yourself. Watch your mouth." (Id. at 119:22-23.) Chapple testified at her deposition that Pelham's remark upset her and caused her to break into tears.

Then, in early 2002, Pelham telephoned Chapple in the office to check his messages. Apparently referencing the fact that Chapple recently had begun living in a new apartment and was sharing the space with another female Fahnestock employee, Pelham said "I hear you guys are roommates together. Boy, you must have men in and out of that apartment all the time. Oh - - wait -- ha, ha -- do you leave the red light on?" (Id. at 152:15-22.)

This kind of behavior, Chapple claims, continued unabated. On February 13, 2002, Fahnestock held a brokers' meeting at the 125 Broad Street office. Chapple was sitting at a desk outside the conference room where the meeting was to be held. As Fahnestock employees began to congregate and enter the room for the meeting, and in response to a joke by an employee that the brokers should be paid $25 to attend the meeting, Pelham stated that "[w]ell, you know, if we pay Josephine $1,000 a meeting, that's going to be a great meeting. Right, guys?" (Id. at 167:12-14.) Pelham made this quite audible comment in Chapple's presence and in front of numerous other Fahnestock employees, many of whom were male. Several of the employees who heard Pelham's comment attempted to comfort her, Chapple says, and told her that they

3

were embarrassed by the incident. Chapple later stated that she interpreted Pelham's remark as calling her a prostitute. (Defs.' Ex. D at 2.)

Chapple asserts that after rebuffing him for his comment about her breasts in late October 2001, Pelham began to retaliate against her by verbally abusing her and by reassigning her to less desirable work in the branch office. On one occasion, Pelham asked Chapple whether she heard a ticking sound and told plaintiff that he had placed a bomb underneath her desk. In April 2002, Pelham twice forced Chapple to take responsibility for a work-related error for which Chapple believed she was not to blame. Chapple asserts Pelham blamed her for the error in order to establish a justification for firing her if she complained about his retaliatory actions.

Pelham's sexually suggestive behavior towards her, Chapple maintains, continued throughout the time period during which she worked for him. Chapple testified at her deposition that Pelham repeatedly leered at her "in a sexual kind of way" that caused her to feel as if Pelham were undressing her with his eyes. (Id. at 144:6-8.) As Pelham looked at Chapple in this manner, he would frequently lick his lips in a sexually provocative way and scratch his crotch.

Sometime in early 2002, Chapple met with Diana Marrero, an employee in Fahnestock's Human Relations Department, to complain about Pelham's conduct. Chapple told Marrero that Pelham had been sexually harassing her and provided Marrero with handwritten notes she had authored that chronicled Pelham's behavior -- and specifically, the conduct described above.

The parties agree that, in April 2002, Chapple was transferred to Fahnestock's Legal Department, where she reported to the company's general counsel, Eric Shames. Chapple contends -- and defendants do not contest -- that upon her reassignment to the Legal Department, Chapple told Shames: "I just need to clear the air here. I don't belong here. You know that, and I know that. So, let's get everything out on the table. And I'm going to tell you everything that

4

happened with Bob Pelham. You know and I know that I do not belong in this department, and this is something to keep me quiet." (Id. at 214:19-215:2.) Chapple also testified at her deposition that she then told Shames in detail about "everything that happened" with Pelham during her first several months at the company. (Id. at 213:11-13.)

In June 2002, Shames walked up behind Chapple while she was seated at her desk in the Legal Department and began to rub Chapple's shoulders. Chapple testified that, in response, she "just looked at him" and said "[p]lease don't do that." (Id. at 216:21-22.) According to Chapple, Shames responded that he was "only massaging your shoulders, Jo." (Id. at 216:23-24.) Chapple told Shames to stop and the parties agree that a "few seconds" later, Shames complied and stopped rubbing her shoulders. (Id. at 221:15-17.) Chapple does not allege that Shames touched her again, either during this encounter or at any other time.

However, according to Chapple, Shames's harassing conduct was not limited to the unwanted massage. Two months later, in August 2002, while Chapple was in his office, Shames told Chapple that she "look[ed] very sexy today." (Id. at 219:2-4.) Chapple admonished Shames for his remark, stating "[h]ow stupid can you be? With everything I told you from before" about Pelham, "how could you say something like that?" (Id. at 219:5-7.) Chapple suggested that Shames could say that she looked "very nice" instead of saying "very sexy." (Id. at 219:7-10.) Shames apparently laughed in response to Chapple's statement and did not say anything further, and Chapple left his office.

Chapple also asserts that, during her tenure with him, Shames on two different occasions asked her to go out to dinner on a date with him. Chapple declined each request, responding to the first invitation by saying that that they should "never, ever go out" together, that Shames was "not [her] type," and by sarcastically referring to Shames as "Napoleon". (Id. at 228:10-14.)

5

Chapple testified that after this rejection "we laughed it off. It was left at that. But still, [Shames] would try -- I know when a guy is hitting on me. . . . I just kept blowing it off, blowing it off, blowing it off." (Id. at 228:15-21.)

Notwithstanding this first rejection, Chapple alleges that Shames asked her out to dinner a second time. Chapple again rejected Shames's invitation, saying, "how many times do I have to tell you, you're not my type." (Id. at 233:8-12.) Plaintiff asserts this second request occurred within a few days of her ultimate termination from Fahnestock, a point defendants in their moving papers dispute. (Defs.' Reply Mem. at 10 & n. 4.)

The parties also disagree about whether, in addition to the conduct already described, Shames engaged in any other allegedly harassing or discriminatory behavior. Chapple asserts that Shames would periodically tell her that he kept her in the Legal Department because she was "good to look at" (id. at 239:9-16) and that he would sometimes make comments to Chapple about how she was dressed -- whether he thought what she was wearing was too short, too tight, or too revealing. Chapple also says that Shames would flirt with her by calling her into his office to take dictation even though Chapple was not his legal secretary and by asking her about what she did on her weekends even though she told him that it was none of his business. Additionally, Chapple testified that when she attended a company outing at a baseball game, Shames singled her out and told her to sit next to him, so he could flirt with her.

On August 2, 2002, two Fahnestock brokers who had worked with Chapple under Pelham's supervision, Adam Reback and Richard Barnett, wrote a letter (the "August 2 Letter") to Fahnestock Vice President Robert Neuoff, with copies sent to Pelham, the company's CEO Albert Lowenthal, and its human resources director, Kathi Coakley. The August 2 Letter advised that Rebeck and Barnett were leaving the company and were considering legal action

6

against Fahnestock as a result of Pelham's allegedly abusive conduct towards them. The August 2 Letter also asserted generally that Pelham had engaged in sexually discriminatory behavior and attached, specifically, handwritten notes made by Reback that detailed the incident when Pelham commented that they should pay $1000 to Chapple to entertain at a brokers' meeting. Coakley affirmed in her affidavit that she received the August 2 Letter, spoke to Neuhoff about it the morning she received it, and was instructed by Neuhoff to discard it.

Two weeks later, on Friday, August 16, 2002, Chapple interviewed for and accepted a new position outside of the Legal Department in the company's retirement benefits group. Her transfer was approved by Neuhoff. At the time she accepted the new position, Chapple had not told Shames that she had been interviewing for a transfer and was instructed by Coakley to inform Shames of her decision to change positions. Chapple asserts that when she did as she was instructed and told Shames that day she was transferring, he became very upset and verbally abused her. After expressing his anger at Chapple, Shames then telephoned Coakley and angrily confronted her about the transfer. He insisted that Chapple be fired. A few minutes after ending the telephone call, Shames left his office to meet personally about the transfer with Coakley and the managers of Chapple's new department, John Niccolae and Bruce Honicky. Coakley claimed that Shames screamed furiously and yelled at her and the two managers "like nothing I have ever seen in a business setting before or even in a child's playground." (Coakley Aff. ¶ 16.) Shames again insisted that Chapple be fired, accusing her of a breach of confidentiality involving the two brokers, Rebeck and Barnett, who had written the August 2 Letter complaining about Pelham. Chapple was not terminated that day and instead was sent home by Coakley with instructions to return to work on the following Monday.

That Monday morning, August 19, 2002, Coakley received a telephone call from CEO

Lowenthal asking if Coakley knew of Chapple and telling her to fire Chapple that day. Coakley

asked Lowenthal if she could speak to him privately about the matter -- Lowenthal had

previously indicated that Shames was in Lowenthal's office at the time of the telephone call --

and began to state that she believed Chapple was being wrongfully terminated. Lowenthal

denied Coakley the opportunity to speak to him alone about the issue and interrupted Coakley to

yell that he expected Chapple to be fired by the close of business that day, which is exactly what

happened.

Chapple contends that defendants have provided several conflicting justifications for her

termination. First, Chapple points out, relying on the Coakley Affidavit submitted by plaintiff on

the motion, that Shames initially justified the termination by saying it was the result of a

confidentially issue involving the brokers Rebeck and Barnett. In contradiction to the averred

initial justification, however, Shames testified at his deposition that he never told Coakley that a

confidentiality breach was the reason for the firing. (Shames Dep. Tr. at 232: 7-10.) Separately,

in its response to a New York State Division of Human Rights ("NYSDHR") inquiry into

Chapple's termination, Fahnestock indeed provided different reasons for the employment action:

> Fahnestock's executive management disapproved of the unprofessional manner in
> which Ms. Chapple sought and subsequently announced her self-imposed re-
> assignment, as well as her inexplicable failure to seek [Shames's] approval to
> both interview for and accept a different position within the firm. . . . The fact
> that Ms. Chapple proved to be at best, a marginal employee, was a significant
> factor in Mr. Shames's decision to terminate her employment.

(Pl.'s Ex. 4 at 3.) These twin justifications were later echoed by Shames, who testified to what

he asserts was Chapple's poor work performance and his disapproval of her handling of the

transfer as the reasons for the termination. Chapple argues more fully that Shames's testimony

on this point is not only contradicted by Coakley's story of what Shames told her was the reason

8

for Chapple's termination prior to its happening, but that the new tale is also internally inconsistent, noting that Shames states both that the "only reason" he terminated Chapple was that "[s]he wasn't a good worker," but also that "had she come to me straight, I absolutely wouldn't have let her go." (Shames Dep. Tr. at 128:20-22; 141:22-23.)

Chapple's firing led her to file a charge with the Equal Employment Opportunity Commission ("EEOC") on June 4, 2003 alleging that she had been sexually harassed while employed at Fahnestock. The EEOC charge stated that Chapple had been "subjected to continual derogatory comments" by Pelham and that those comments and the "associated treatment" that accompanied them caused her to be "humiliat[ed]." (Defs.' Ex. D at 2.) While the parties battle about the extent to which Chapple's EEOC charge may be read to implicate Shames in the allegations of sexual harassment, the charge itself alleges that Chapple was "harassed and terminated from [Fahnestock] because of [her] sex and gender," that Shames terminated her for a "personal reason," and that the reason given for her termination was "bogus and disingenuous." (Id.) When asked during her deposition if she considered Shames's conduct towards her to be offensive, Chapple stated:

> You know, honestly, after Pelham -- oh, my God -- or something's got to open up soon, because I got to get out of this department, really. Right now, I have to stay here. . . . [T]here's no jobs, there's no money. I got bills to pay. I have rent to pay. You just ignore it. What I was learning to do is just ignore it, let it go. Something's going to happen. Something's going to break.

(Chapple Dep. Tr. at 241:2-13.)

## II. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Standard for Summary Judgment

Under the Federal Rules of Civil Procedure, a district court must grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court's responsibility in assessing the merits of a summary judgment motion is thus not to try issues of fact, but rather to "determine whether there *are* issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)). Accordingly, the moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see, e.g., Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005), and the evidence presented will be construed liberally in favor of the party opposing the motion, see, e.g., Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden then shifts to the nonmoving party to present "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to satisfy its burden and defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). In determining whether to grant summary judgment, the reviewing court must not take a piecemeal view of the record, but rather should view the evidence presented as a whole. See Howley v. Town of Stratford, 217 F.3d 141, 151 (2d Cir. 2000).

The Court also notes that it must be particularly cautious about granting summary judgment to an employer in a discrimination case such as this in which the employer's intent is in question. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); McLee v. Chrysler Corp., 38 F.3d 67, 68 (2d Cir. 1994). "Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citing Gallo, 22 F.3d at 1224). However, this extra exercise of caution does not render summary judgment unavailable to a defendant in a discrimination case. Summary judgment must be granted if, based on the evidence presented, no reasonable trier of fact could conclude that discrimination was a determinative factor in the defendants' actions. See, e.g., Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000). Summary judgment may also be entered in a discrimination case "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Morris v. New York City Dep't of Sanitation, No. 99-CV-4376, 2003 WL 1739009, at *3 (S.D.N.Y. Apr. 2, 2003) (citing Anderson, 477 U.S. at 247); see also Meiri, 759 F.2d at 998 ("[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases").

## B.   Chapple's Claims

Chapple asserts three claims of sex discrimination against defendants Fahnestock, Pelham, and Shames and originally identified as bases for each cause of action Title VII, 42 U.S.C. § 1981, the Thirteenth and Fourteenth Amendments to the United States Constitution, the New York Constitution, and the New York State Human Rights Law, N.Y. EXEC. LAW § 290 *et*

11

*seq.* The first claim is that defendants subjected Chapple to a hostile work environment; the second alleges defendants retaliated against her when she complained about the discriminatory treatment she received; and the last alleges that defendants subjected Chapple to *quid pro quo* sexual harassment and terminated her when she refused to submit to defendants' unwelcome sexual advances. The claims brought pursuant to the Thirteenth and Fourteenth Amendments were disposed of by a stipulation between the parties, entered April 14, 2004. *See* Docket Entry No. 9. By Memorandum and Order dated June 2, 2004, this Court (per Garaufis, J.) dismissed Chapple's claims under (1) 42 U.S.C. § 1981, as against all defendants; (2) the New York Constitution, as against all defendants; and (3) Title VII, as against Pelham and Shames, only. *See* Docket Entry No. 16. Chapple's claims against Fahnestock under Title VII and NYSHRL survived, as did her claims against Pelham and Shames under NYSHRL. Defendants here move for partial summary judgment dismissing Chapple's NYSHRL claims against Shames only.

To the extent the Court has subject matter jurisdiction to entertain Chapple's NYSHRL claims, they are analyzed substantively under the framework established for federal Title VII claims.[3] See Petrosino v. Bell Atlantic, 385 F.3d 210, 220 n. 11 (2d Cir. 2004). In consequence, as to the state claims interposed against Shames, the Court must first determine if it can and should exercise pendent jurisdiction, the only basis of jurisdiction apparent from the filings, and if it does, whether the claims can survive the motion for summary judgment.

Stated differently, this Court's earlier dismissal of Chapple's federal causes of action against Pelham and Shames does not automatically relieve it of its jurisdiction over the claims Chapple alleges against them that arise under state law. "Pursuant to 28 U.S.C. § 1367(a), when a federal district court has original jurisdiction over some defendants in an action due to the

---

[3]     Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

12

nature of the claims against those defendants, it also has supplemental jurisdiction over pendent

parties and claims, so long as the cause of action against those other defendants arises from the

same case or controversy." Rothberg v. Chloe Foods Corp., No. 06-CV-5712, 2007 WL

2128376, at *8 (E.D.N.Y. July 25, 2007). Here, plaintiff's Title VII claim against Fahnestock,

which, again, is unchallenged on summary judgment, vests the Court with original subject matter

jurisdiction and Chapple's state law sex discrimination claims -- asserted against the individual

employees whose conduct constitutes the primary basis for liability against the company --

clearly share with that federal claim "a common nucleus of operative facts." Cadely v. New

York City Dep't of Trans., No. 04-CV-8196, 2008 WL 465199, at *10 (S.D.N.Y. Feb. 16, 2008)

(exercising supplemental jurisdiction over state law claims that arose "out of the same

employment relationship and involve many of the same individuals" as plaintiff's Title VII and §

1983 claims) (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966)). It is thus both

proper and -- given the time and resources already expended on this case -- in the interests of

fairness and judicial economy, that the Court elects to exercise its supplemental jurisdiction over

Chapple's claims under NYSHRL. Id.

1.     The Hostile Work Environment Claim

A hostile work environment exists where "the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter

the conditions of the victim's employment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

In order to prevail on a hostile work environment claim, a plaintiff must persuade the factfinder

that "the work environment both objectively was, and subjectively was perceived by the plaintiff

to be, sufficiently hostile to alter the conditions of employment for the worse." Schiano v.

Quality Payroll Sys., Inc., 445 F.3d 597, 604 (2d Cir. 2006).

Among the factors that the factfinder should consider in determining whether a hostile work environment exists are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." Harris, 510 U.S. at 23. These factors are not exhaustive, nor is any single factor required. Schiano, 445 F.3d at 605. Beyond doubt, determining "whether sexual harassment alters the conditions of employment 'is not, and by its nature cannot be, a mathematically precise test [and] can be determined only by looking at all the circumstances." Id. (quoting Harris, 510 U.S. at 22, 23). While incidents of harassment generally must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive," even "a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace." Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotations omitted). The test is "whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*. The environment need not be unendurable or intolerable" to be actionable. Id. (emphasis in original; internal quotations and citations omitted). "The fact that the law requires harassment to be severe or pervasive . . . does not mean that" bad actors are "free from liability in all but the most egregious cases." Id.

At the start of the inquiry it bears re-emphasizing that, although a discrimination claim is by no means immune from summary judgment if there is no genuine issue of material fact and if no reasonable trier of fact could conclude that the plaintiff is entitled to relief, see Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001), hostile work environment claims "present mixed questions of law and fact that are especially well-suited for jury determination." Schiano, 445 F.3d at 605. As the Second Circuit has observed, an "Article III judge is not a

14

hierophant of social graces and is generally in no better position than a jury to determine when conduct crosses the line between boorish and inappropriate behavior and actionable sexual harassment. . . . [A]lthough that line is admittedly indistinct, its haziness counsels against summary judgment." Id.

Chapple alleges that Shames's conduct contributed to a hostile work environment for which her former employer, Fahnestock, is liable, and for which Shames himself is responsible under NYSHRL as an actual participant in the discrimination. Just like Title VII, NYSHRL prohibits an employer from discriminating on the basis of sex in the terms, conditions, or privileges of employment, N.Y. EXEC. LAW § 296(1)(a), but, unlike Title VII, also makes it unlawful for "any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this article, or to attempt to do so, id. at § 296(6). The Second Circuit, interpreting the relevant decisions of the New York Court of Appeals, has held that individual civil liability is established under NYSHRL when any one of three conditions is met. See Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) (citing Patrowich v. Chemical Bank, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984)). Specifically, a plaintiff may proceed against an individual defendant under the direct liability provision of NYSHRL, § 296(1)(a), if the defendant either, first, has an ownership interest in the employer or, second, has the power to hire and fire the plaintiff. Id.; see also Russo-Lubrano v. Brooklyn Fed. Sav. Bank, No. 06-CV-0672, 2007 WL 121431, at *8 (E.D.N.Y. Jan. 12, 2007). As a third option, a defendant who "actually participates in the conduct giving rise to a discrimination claim" may be found liable under NYSHRL's aiding and abetting section, § 296(6). Tomka, 66 F.3d at 1317; see also Feingold, 366 F.3d at 157-58 & n. 19; Russo-Lubrano, 2007 WL 121431, at *8.

The complaint does not allege that Shames possessed an ownership interest in Fahnestock. However, Chapple asserts that Shames did have the power to fire her -- and indeed, that he exercised that power -- and, secondly, that he actually participated in the alleged discrimination himself by sexually harassing her. Chapple's individual claim for hostile work environment against Shames thus may survive summary judgment if a rational factfinder could conclude that (1) Chapple was subjected to a hostile work environment, following the standards controlling such a claim under Title VII; and (2) Shames either had the power to hire and fire Chapple or actually participated in the creation of the hostile work environment. See Feingold, 366 F.3d at 157-58; Tomka, 66 F.3d at 1317; Dawson v. County of Westchester, 351 F. Supp. 2d 176, 198-99 (S.D.N.Y. 2004).

a.  **The Existence of a Hostile Work Environment**

Chapple bases her hostile work environment claim on the alleged words and actions of Pelham and Shames, each of whom, at different times, exercised supervisory authority over her. With respect to Pelham, Chapple describes in detail three separate incidents in which Pelham made harassing comments of a sexual nature towards her. In one of these episodes Pelham referred specifically to Chapple's anatomy, while in the others a reasonable person could conclude that Pelham compared Chapple to a prostitute. Moreover, two of the offensive statements occurred in the presence of other Fahnestock employees, eliciting laughs from at least one coworker and sympathy and embarrassment from others. Chapple also states that Pelham verbally abused her and gave her less desirable assignments around the office in retaliation for her sharp response to his first comment about her body, and that he attempted to hold her responsible for work-related errors for which she was not to blame. Chapple asserts finally that in the approximately five to six months she worked for Pelham, he repeatedly leered at her "in a

sexual kind of way" that caused Chapple to feel as if he were undressing her with his eyes, and that while doing so he would frequently lick his lips in a sexually provocative way and scratch his crotch. (Chapple Dep. Tr. at 144:6-8.)

Chapple testified that upon being transferred to Fahnestock's Legal Department, she promptly informed Shames, as general counsel, in detail about "everything that happened" during her first several months of employment. (Id. at 213:11-13.) Rather than take action to at least investigate the behavior about which she complained, Chapple avers that Shames made matters worse by harassing her himself. In this regard, Chapple referred to the one instance Shames began to massage her shoulders without asking for permission and of her immediate demand that he stop. Chapple also claims that Shames told her on one occasion that she "look[ed] very sexy today" and that she admonished him for this comment too and reminded him about the previous harassment she received from Pelham. (Id. at 219:2-4.) Nevertheless, Shames continued to press for a personal relationship with her, twice asking Chapple out on a date -- including once shortly before her ultimate termination. According to Chapple, Shames made other remarks -- periodically telling her that he kept her in the Legal Department because she was "good to look at" (id. at 239:9-16) and sometimes commenting on her appearance -- and engaged in other behavior -- including attempting to flirt with her in the office and at a company baseball outing but then verbally abusing her shortly before her termination -- all of which exacerbated her feelings of helplessness and humiliation.

It is on this record that the Court must determine whether a reasonable factfinder could conclude that Chapple was subjected to a hostile work environment. See Schiano, 445 F.3d at 605. The evidence, the Court finds, is surely sufficient to permit the conclusion that a reasonable person in Chapple's position would have found the same experiences to be sufficiently hostile to

alter the conditions of her employment for the worse. Id. at 604. Chapple details with specificity more than a half-dozen incidents of claimed discriminatory conduct by Pelham or Shames over the course of her ten-month employment, and describes more generally other allegedly inappropriate behavior -- most troublingly, Pelham's alleged repeated pattern of leering at plaintiff while making obscene sexually suggestive gestures and expressions, but also Shames's remarks and unwanted attempts at flirtation. Mindful that there is no rigidly precise test for determining whether sexual harassment creates an actionably hostile work environment and that whether harassing conduct is pervasive is "the sort of issue that is often not susceptible of summary resolution," the Court cannot say as a matter of law that the various incidents alleged by Chapple are not sufficiently pervasive. See DiLaurenzio v. Atlantic Paratrans, Inc., 926 F. Supp. 310, 314 (E.D.N.Y. 1996). This is the case despite the fact that Chapple is unable to provide exact dates and specific details for some of the incidents she describes. While her failure thus far to flesh out some -- but by no means all -- of her allegations with extensive particulars *may* give a jury reason to doubt whether she finally should prevail on her claims, it does not mandate that conclusion. See Torres v. Pisano, 116 F.3d 625, 631 (2d Cir. 1997). A factfinder, weighing all of the admissible evidence and giving credit to Chapple's assertions, both specific and general, of ongoing discriminatory conduct by Pelham and Shames, reasonably could determine that Chapple had been subjected to a hostile work environment. Id.; see also Leopold v. Baccarat, Inc., 174 F.3d 261, 268-69 (2d Cir. 1999) (vacating district court's directed verdict on hostile work environment claim; jury was entitled to find discrimination against plaintiff despite testimony that was "somewhat inconsistent with respect to the frequency" of the derogatory comments at issue).

18

Chapple, moreover, effectively testified that she told appropriate Fahnestock managers about Pelham's discriminatory conduct on at least two occasions, first, when she informed a human resources employee about Pelham's behavior in early 2002, and, second, after her transfer in conversation with her new supervisor, Shames, who, coincidentally, was the company's chief attorney. Fahnestock's apparent failure even to investigate Pelham's behavior reasonably could be considered an aggravating factor contributing to a hostile work environment. See Schiano, 445 F.3d at 607 n. 7 ("[i]f the employer had been slower to punish his misbehavior, that neglect would have been an additional factor to consider in assessing the plaintiff's overall work environment. It seems reasonable to view unpunished misconduct as being more harmful or harassing than punished misconduct"). Indeed, then, on the evidence presented by Chapple, a jury could conclude not only that Pelham's discriminatory conduct went unpunished, but that Shames exacerbated the problem by discriminating against Chapple himself. Put mildly, it is not unreasonable for a factfinder to determine that a supervisor to whom complaints of sexual harassment have been made alters the complaining employee's working conditions for the worse when that supervisor himself subsequently embarks on behavior that might reasonably be viewed as independently sexually harassing. See Dey v. Cold Constr. & Dev. Co., 28 F.3d 1446, 1456 (7th Cir. 1994) (incident of alleged harassment "would no doubt be even more frightening to a reasonable women in [plaintiff's] position who, prior to that incident, had endured more than two years of verbal harassment"); see generally Feingold, 366 F.3d at 151 (objective prong of hostile work environment standard satisfied where evidence allowed jury to conclude that a "reasonable employee in [plaintiff's] position" would have found her work environment transformed for the worse).

On another level, Chapple provides evidence sufficient for a reasonable jury to conclude that she subjectively experienced a hostile work environment, as well. Chapple expressed in the EEOC charge she filed that the claimed hostile treatment humiliated her and that she interpreted Pelham's suggestion, made in front of numerous colleagues, that she be paid $1000 to entertain them, as calling her a prostitute. She testified at her deposition that she felt mistreated and violated by Pelham and that his October 2002 comment about her anatomy caused her to cry and become visibly upset. In response to a question about whether she found Shames's conduct towards her to be offensive, Chapple stated:

> You know, honestly, after Pelham -- oh, my God -- or something's got to open up soon, because I got to get out of this department, really. Right now, I have to stay here. . . . [T]here's no jobs, there's no money. I got bills to pay. I have rent to pay. You just ignore it. What I was learning to do is just ignore it, let it go. Something's going to happen. Something's going to break.

(Chapple Dep. Tr. at 241:2-13.) The law does not require a Title VII plaintiff to go so far as to prove she suffered a nervous breakdown as a result of harassing conduct in order to prevail on a hostile work environment claim. Harris, 510 U.S. at 22. "A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." Id.

Defendants' arguments to the contrary do not support the conclusion that no triable issues of fact are presented. For example, defendants contend that Shames's conduct "do[es] not even come close" to constituting an actionable hostile work environment. (Defs.' Mem. Supp. Summ. J. at 7.) But whether Shames's conduct *alone* can establish a hostile work environment is, in the first place, not the issue. Rather, the standard for evaluating individual liability under NYSHRL is whether the defendant has "actually participated" in the harassment; the defendant need not be

20

solely responsible for generating the actionable hostile environment. See, e.g., Feingold, 366 F.3d at 157-58 & n. 19; Tomka, 66 F.3d at 1317. Therefore, at threshold, the relevant inquiry is whether, upon a review of "all the circumstances" for which plaintiff has provided admissible evidence, there is a triable issue as to the existence of a hostile work environment. Schiano, 445 F.3d at 605. Here, this requirement means that the Court must consider not only Shames's actions but the impact of Pelham's conduct, too. Id. The totality of these circumstances leads the Court to conclude that plaintiff has succeeded in raising a fact issue concerning the existence of a hostile work environment. That conclusion is only underscored by defendants' choice to concede the sufficiency of Chapple's allegations as to Pelham at the summary judgment stage.[4]

Defendants also protest that "there is no evidence that Shames even knew about" Pelham's conduct towards Chapple, "let alone" that Shames contributed to the problem once Chapple was transferred to his supervision. (Defs.' Reply Mem. at 13.) But, that is for the finder of fact, since there is record evidence to the contrary in Chapple's deposition testimony that, at the time of her transfer, she told Shames: "I just need to clear the air here. I don't belong here. You know that, and I know that. So, let's get everything out on the table. And I'm going to tell you everything that happened with Bob Pelham. You know and I know that I do not belong in this department, and this is something to keep me quiet." (Id. at 214:19-215:2.) More importantly, she then told Shames specifically, she says, about "everything that happened" with Pelham during her first several months at Fahnestock. (Id. at 213:11-13.) The evidence of Shames's knowledge is reinforced by Chapple's further testimony that, in response to a comment from Shames that she "look[ed] very sexy today," Chapple told him: "[h]ow stupid can you be? With everything I told you before" about Pelham, "how could you say something like that?" (Id.

---

[4]     Defendants expressly declined to move for summary judgment on behalf of Pelham and Fahnestock and acknowledge the existence of genuine issues of material fact as to those defendants in their moving papers. (Defs.' Mem. Supp. Summ. J. at 2 n. 3.)

at 219:2-7.) Whether or not a jury ultimately credits Chapple's sworn version of the facts in no

way diminishes her proffer of admissible proof establishing solidly that there are issues for a jury

to decide and that summary judgment is inappropriate. See Schiano, 445 F.3d at 608.

Nor does the quibble about the number of sexually harassing acts Chapple alleges

Shames committed matter. While defendants focus on four primary acts -- the massage, the two

requests for dates, and the "very sexy" comment (see, e.g., Defs.' Mem. Supp. Summ. J. at 7-8) -

- plaintiff testified that Shames made other remarks -- the "good to look at" comments, as well as

periodic remarks about the way she was dressed -- and committed other acts -- including trying

to flirt with her in the office and at a baseball game, and verbally abusing her shortly before her

termination. Quite to the contrary, this roundabout only underscores that there are present

relevant factual issues precisely of the kind that a jury must resolve. Schiano, 445 F.3d at 608. [5]

Finally, defendants argue that Chapple's own testimony concerning her reaction to

Shames's harassing comments and requests for dates refutes the suggestion that Chapple found

his actions subjectively offensive. (Defs.' Mem. Supp. Summ. J. at 11 n. 6; Defs.' Reply Mem.

at 14-15 & n. 8.) The argument overlooks the fact that Chapple has stated she felt humiliated

and violated by the work environment at Fahnestock, that she had been reduced to tears on at

least one occasion as a result of her experiences, that she had been made to feel like a prostitute,

---

[5]     Defendants also attempt to discount Chapple's allegations that Shames inappropriately tried to flirt with her
and verbally abused her by arguing that the examples of the behavior Chapple points to are either innocuous or
"non-sexual." (Defs.' Reply Mem. at 13-14.) As an initial matter, whether Chapple's examples of Shames's
inappropriate attempts to flirt truly are facially-neutral is an open question that is best left to a factfinder to
determine. However, even assuming, *arguendo*, that these incidents and the verbal abuse were sex-neutral on their
face, they still may be considered as part of the totality of the circumstances outlined by Chapple, "so long as a
reasonable fact-finder could conclude that [the incidents] were, in fact, based on sex." Alfano v. Costello, 294 F.3d
365, 378 (2d Cir. 2002) (facially-neutral incidents may be considered in a hostile work environment analysis where
there is "some circumstantial or other basis for inferring that [the incidents] were in fact discriminatory"). Here, in
light of all the other evidence presented by Chapple, and for the reasons set forth above, a reasonable juror could
conclude that Shames's alleged attempts to flirt and his verbal abuse of Chapple were examples of gender
discrimination. See Howley, 217 F.3d at 155-56 (factfinder was entitled to infer that perpetrator's facially-neutral
harassment of plaintiff was gender-based in light of his previous sexually derogatory statements).

22

and indicates that she felt trapped by Shames's conduct.[6] The Court holds that a reasonable factfinder could conclude on the basis of this evidence that Chapple subjectively perceived her work environment to be hostile and that Shames had a role, even if the factfinder were to deem it minimal, in its perpetuation. To the extent that there are any inconsistencies in her testimony, the issues they raise are for the jury to decide.

### b.    Actual Participation by Shames in the Harassment

Having determined that Chapple has produced sufficient evidence to raise a genuine issue of material fact about whether she was subjected to a hostile work environment, the focus is next on the issue of "actual participation" by Shames in creating that environment. The inquiry begins with the unassailable recognition that Chapple has produced competent evidence to indicate that Shames (1) knew of Chapple's prior discriminatory treatment at the hands of Pelham; (2) did nothing to investigate or punish that conduct; and (3) proceeded to engage in behavior of his own that she claims was sexually harassing. The inquiry need proceed no further, for on that evidentiary basis alone, a triable issue of fact is presented on the NYSHRL hostile work environment claim against Shames. See Feingold, 366 F.3d at 158 (reversing summary judgment for two individual defendants who "took no action to remedy [the discriminatory] behavior although they were aware of it, [and] also terminated [plaintiff's] employment on the basis of impermissible factors"); Horvath v. American Tissue Corp., 210 F. Supp. 2d 189, 193-94 (E.D.N.Y. 2002); Dawson, 351 F. Supp. 2d at 199. Summary judgment for Shames on the hostile work environment claim, therefore, must be denied.

---

[6]    The Court further notes that Chapple's deposition transcript and Local Rule 56.1 Statement indicate that she became emotional at times recounting her experiences during her deposition.

## 2.   The *Quid Pro Quo* Claim

Quid pro quo sexual harassment occurs when "submission to or rejection of unwelcome sexual conduct by an individual is used as the basis for employment decisions affecting such individual." Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994) (citing 29 C.F.R. § 1604.11(a)(2)). In order to establish a *prima facie* case of *quid pro quo* harassment, "a plaintiff must present evidence that she was subject to unwelcome sexual conduct, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions, or privileges of her employment." Id. The "relevant inquiry" in these cases "is whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances. It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions, or privileges of the employee's job." Id. at 778.

Chapple alleges that Shames sexually harassed and pursued her while he supervised her, that she rebuffed his advances, and that, within days of and in retaliation for a final rejection, he terminated her employment. Defendants counter by arguing that (1) the examples Shames's behavior proffered by Chapple do not involve sexual conduct; (2) Chapple fails to provide evidence of a causal connection between Shames's alleged sexual conduct and Chapple's termination; and (3) even assuming Chapple has made out a *prima facie* case, defendants have provided a legitimate, nondiscriminatory reason for Chapple's termination that Chapple has failed to rebut with evidence of pretext.

The sufficiency of plaintiff's evidence on this point presents a close question. Nevertheless, construing the facts in the light most favorable to Chapple, the Court concludes she has presented sufficient evidence on which a reasonable factfinder might find in her favor at trial.

### a.    Sexual Conduct

"Sexual conduct encompasses sexual demands, sexual overtures, sexual harassment and prohibited conduct." Adeniji v. Admin. for Children Servs., NYC, 43 F. Supp. 2d 407, 431 (S.D.N.Y. 1999). Thus, while overt requests for sexual favors are of course prohibited, so too are implicit sexual pressures and harassing conduct. Gallagher v. Delaney, 139 F.3d 338, 346 (2d Cir.1998) ("[a] jury could find, based on its cumulative perceptions and backgrounds, that requests for sexual activity are not always made explicitly, and that [a supervisor's] failure to directly demand sexual favors as a condition of [plaintiff's] continued terms of employment did not negate indirect pressure"), abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998). In Gallagher, plaintiff produced evidence indicating that her supervisor gave her gifts, complimented her on her physical appearance, repeatedly invited her to lunch and other events, asked her "personal" questions, and made at least one or two sexually suggestive comments. Id. at 343-44. Noting that "[w]hether particular conduct was . . . unwelcome presents difficult problems of proof," the Second Circuit concluded that plaintiff's evidence was sufficient to allow her claim to survive summary judgment. Id. at 346; see also Gregg v. New York State Dep't of Taxation & Fin., No. 97-CV-1408, 1999 WL 225534, at *10-11 (S.D.N.Y. 1999) (denying summary judgment where supervisor made "repeated invitations to meals and the like," complimented victim's physical appearance, asked "personal" questions, touched victim "on at least four occasions in an offensive manner," and required victim to check in via e-mail).

Chapple's evidence does permit, the Court finds, a reasonable jury to conclude that she was subjected to unwanted sexual conduct from Shames. A rational factfinder could properly credit Chapple's testimony that Shames massaged her shoulders without permission, told her on one occasion that she "look[ed] very sexy" (Chapple Dep. Tr. at 219:2-4), commented

periodically that he kept her in the Legal Department because she was "good to look at" (id. at 239:9-16), commented periodically about her appearance, occasionally inquired about her personal life despite her answers that such questions were unwelcome, inappropriately attempted to flirt with her, and twice asked her on dates. Further, based on Chapple's response to these incidents -- including her rejection of the massage and of his requests for dates, her blunt admonition of him after the "very sexy" comment, and her statement that her weekend plans were none of his business -- a reasonable jury could infer that Shames's conduct was not only sexual in nature but also unwelcome. Succinctly, that Chapple fails to allege Shames explicitly requested sexual favors does not, as a matter of law, doom her claim at the summary judgment stage. Gallagher, 139 F.3d at 346. A jury, "based on its cumulative perceptions and backgrounds" and on the totality of the circumstances presented by Chapple, reasonably could conclude that Shames's conduct was sexually discriminatory. Id.; see generally Gregory v. Daly, 243. F.3d 687, 699-700 (2d Cir. 2001).

**b.    Causal Connection**

In order to make out a *prima facie* case on a *quid pro quo* claim, however, a plaintiff not only must show that her supervisor subjected her to sexual conduct, she must also provide enough evidence to indicate that the supervisor "used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions, or privileges of the employee's job." Karibian, 14 F.3d at 778; Tabachnik v. Jewish Theological Seminary, No. 03-CV-2759, 2004 WL 414826, at *2 (S.D.N.Y. Mar. 4, 2004) (requiring "some evidence of a causal connection between the alleged sexual harassment and [plaintiff's] termination" to avoid summary judgment). Likely the easiest way for a plaintiff to demonstrate such a causal connection is with direct evidence that the offending supervisor threatened or

warned the plaintiff that her failure to accede to his sexual advances would result in an adverse employment action. Nevertheless, where direct evidence is lacking, a plaintiff still may survive summary judgment by providing circumstantial proof that "an adverse employment action followed closely in time after the employee rejected or complained about the supervisor's sexual advances." Adeniji, 43 F. Supp. 2d at 433; see Reed v. A. W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996); Tomka, 66 F.3d at 1308. Where a plaintiff relies on evidence of temporal proximity, the case law "uniformly hold[s]" that the temporal link "must be very close." Clark Co. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (describing case law concerning causal connection requirement in context of a Title VII retaliation case); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) (same). While the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," Gorman-Bakos v. Cornell Co-op Extension, 252 F.3d 545, 554 (2d Cir. 2001), time periods of approximately two months or less generally have been held to be sufficient, see Gregg, 1999 WL 225534, at *11 (space of "a few weeks" between reaction to supervisor's conduct and subsequent adverse employment action sufficient); see also Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 561 (S.D.N.Y. 2005) (noting, in the context of a retaliation case, that "a passage of two months . . . seems to be the dividing line"); Cunningham v. Consol. Edison Inc., No. 03-CV-3522, 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (three months too remote); Reed, 95 F.3d at 1178 (twelve days sufficient); Feingold, 366 F.3d at 138 (two weeks sufficient); Lovejoy-Wilson, 263 F.3d at 224 (less than a month sufficient).

Chapple alleges that Shames's sexually harassing behavior occurred over the span of about three months, starting approximately in June 2002 (with the unwanted massage) and

culminating in mid-August, with his second request that she go on a date with him, her rejection of that request, and his termination of her. Defendants respond by asserting that Chapple's deposition testimony in fact indicates that she did not recall the dates on which Shames asked her to dinner and that the timing between Shames's other conduct and Chapple's termination is too remote to support an inference of causation. (Defs.' Reply Mem. at 10 & n. 4.)

Defendants are correct, of course, that Chapple testified that she did not recall the dates on which Shames asked her to dinner. But, Chapple also testified -- in greater detail -- that Shames's second date request occurred shortly before her termination. Regardless of whether there is any discrepancy in Chapple's testimony as to the timing of all the harassing sexual conduct, it is sufficient that a reasonable factfinder could credit Chapple's more detailed testimony about the timing of the second date request, and Chapple's rejection of it, and conclude that this extant act of claimed harassment occurred within a few days at most of her ultimate termination. See Goldman v. Admin. For Children's Servs., No. 04-CV-7890, 2007 WL 1552397, at *12 (S.D.N.Y. May 29, 2007). Clearly, construing the testimony in this fashion, and which is in the light most favorable to Chapple, Capobianco, 422 F.3d at 54-55, the Court finds that the alleged temporal nexus of a few days between Chapple's rejection of an alleged act of sexual conduct by Shames and her subsequent termination at his order is sufficient to establish the requisite causal connection for a *prima facie* case of *quid pro quo* sex discrimination, see, e.g., Gregg, 1999 WL 225534, at *11.

c.      **Defendants' Proffered Reasons for Chapple's Termination**

Even though Chapple succeeds in establishing her *prima facie* case, Shames still may be entitled to summary judgment on the claim if he is able to present a legitimate, nondiscriminatory reason for Chapple's termination. McDonnell Douglas Corp. v. Green, 411

28

U.S. 792, 802-03 (1973). If defendants are able to put forth evidence of a nondiscriminatory basis for the termination, the presumption of discrimination that attaches at the time plaintiff made out her *prima facie* case "drops out of the picture," St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993), and the burden shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). "In the summary judgment context, this means that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for [the adverse action] is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." Morris, 2003 WL 1739009, at *4 (citing Taggart v. Time Inc., 924 F.2d 43, 46 (2d Cir. 1991)). A court deciding a summary judgment motion must use a "case by case" approach that evaluates "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." James v. New York Racing Ass'n, 233 F.3d 149, 156 (2d Cir. 2000). A plaintiff "may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." Taylor v. Family Residences and Essential Enters., Inc., No. 03-CV-6122, 2008 WL 268801, at *8 (E.D.N.Y. Jan. 30, 2008) (internal quotations omitted). If the plaintiff does not provide evidence that would allow a rational factfinder to infer that the employer's rationale is pretextual, summary judgment is appropriate. See Smith v. American Express Co., 853 F.2d 151, 154-55 (2d Cir. 1988).

Defendants contend that Chapple anticipated being fired for her allegedly poor work performance and unprofessionally engineered her transfer to another department within the company by ignoring proper procedure -- i.e., by failing to speak beforehand to her then current supervisor, Shames. Defendants argue that the combination of Chapple's lack of professionalism and poor work habits led Shames to conclude she should be terminated. If true, these reasons would be legitimate and nondiscriminatory.

But, they do not command summary relief. Chapple has presented enough admissible proof to allow a reasonable factfinder to conclude that defendants' reasons for Chapple's termination were a pretext for discrimination. First, plaintiff asserts that defendants' supposedly legitimate justifications for the firing are muddled, contradictory, and implausible, especially when compared to the more reasonable inference that the termination was discriminatory. More powerfully, Chapple rests this argument on the affidavit of Fahnestock's human resources director, Kathi Coakley, who states that Shames told her Chapple's termination was to be justified on Chapple's breach of confidentially involving the brokers Rebeck and Barnett. However, at his deposition, Shames denied such motivation, testifying that he never told Coakley that a confidentiality breach was the reason for the firing. (Shames Dep. Tr. at 232: 7-10.) Although the deposition testimony may be accurate, a reasonable factfinder could choose to credit Coakley's recollections of what Shames stated at the time of the termination, allowing the inference from the discrepancy that defendants' nondiscriminatory justification should not be believed and certainly requiring a finding that a material fact is in dispute. Giannone v. Deutsche Bank Sec., Inc., 392 F. Supp. 2d 576, 588 (S.D.N.Y. 2005) (denying summary judgment where defendant's "inconsistent explanations [as to the reason for plaintiff's termination] creates an issue of fact as to whether the reason it currently asserts is pretextual"); see generally Reeves v.

Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive").

The dual justifications on which defendants do rely -- Chapple's (1) lack of professionalism and (2) poor work performance -- as articulated in Fahnestock's official response to the NYSDHR inquiry and, in varying degrees, by Shames at his deposition, are far from dispositive. Indeed, defendants' explanations may not even square with their own proof. Straightaway, Shames's testimony, on the one hand, that the "only reason" he terminated Chapple was that "[s]he wasn't a good worker," but, on the other, that "had she come to me straight, I absolutely wouldn't have let her go," is, at the least, puzzling (if not contradictory, as Chapple claims). (Shames Dep. Tr. at 128:20-22; 141:22-23.) At minimum, critically, it tends to place in doubt the credibility of any justification offered by defendants for Chapple's termination. See Roge v. NYP Holdings, Inc., 257 F.3d 164, 170 (2d Cir. 2001) ("a jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff"). Taking this jumble of deposition testimony together with the discrepancy created by the Coakley Affidavit, the Court concludes that Chapple has shown that there is a genuine issue of material fact concerning whether the reasons given by defendants for her termination were pretextual. Id.; Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 98 (2d Cir.1999) (holding that where contradictory rationales are presented to justify a plaintiff's termination, the "job of reconciling them (or not) belongs to the factfinder and is not appropriate for resolution as a matter of law").

The paucity of record evidence underlying defendants' assertion that Chapple was a poor worker only cements this conclusion. Save for Shames's deposition testimony to the effect that

31

Chapple was not performing up to expectations and was in danger of being fired, defendants do not point to any other record of her poor work performance. While a reasonable juror certainly could conclude that Shames, as Chapple's supervisor, was perhaps in the best position to judge Chapple's work performance and that he may have had legitimate concerns, this inference certainly is not required by the record. The facts that, as far as the Court can tell, Chapple never received from Shames "a negative written performance evaluation or formal warning, and that there is no writing whatsoever criticizing [her] job performance . . . indicate that[,] as a reason for [her] firing[,] poor job performance may have been an afterthought." Snyder v. Advest, Inc., No. 06-CV-1426, 2008 WL 4571502, at *4 (S.D.N.Y. June 8, 2008) (quoting Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (reversing grant of summary judgment where "inconsistency between the justifications offered for [plaintiff's] dismissal . . . raises a genuine issue of material fact with regard to the veracity of" defendants' asserted justifications)); Morgenstern v. County of Nassau, No. 04-CV-0058, 2008 WL 4449335, at *15 (E.D.N.Y. Sept. 29, 2008) (denying summary judgment where defendants' proffered reasons for plaintiff's termination were inconsistent and included allegations of "poor work performance, for which [defendants] have provided no documentation").

For these reasons, and because Chapple has alleged sufficient facts to indicate that Shames "actually participate[d] in the conduct giving rise to" this cause of action, see Feingold, 366 F.3d at 157-58, defendants' motion for summary judgment as to Shames on the *quid pro quo* claim is denied.

**3.      The Retaliation Claim**

Finally, Chapple also alleges that defendants, including Shames, "retaliated against [her] for her complaints regarding intentional discriminatory treatment at her workplace by demoting

her and creating a harassing and burdensome working environment." (Compl. ¶ 34.) Though defendants profess to move for summary judgment as to (presumably all of) plaintiff's causes of action against Shames, nowhere in defendants' submissions to the Court do they attempt to address in any way Chapple's retaliation claim. As the moving party, defendants bear the burden of demonstrating that there is no genuine issue as to any material fact for each of the claims against which they seek summary judgment. See, e.g., Jeffreys, 426 F.3d at 554. Defendants' Local Rule 56.1 Statement does not suggest undisputed facts on which the Court might base a judgment on the retaliation claim, and defendants fail to put forth any argument explaining why summary disposition in Shames's favor might be appropriate. Defendants' motion for summary judgment as to Shames on the retaliation claim, accordingly, is denied as well.

## III.    PLAINTIFF'S MOTION FOR SANCTIONS AND COSTS

Responding to what plaintiff perceives to be defendants' frivolous motion for partial summary judgment, Chapple cross-moves for sanctions and costs under Rule 11 and 28 U.S.C. § 1927. Defendants retort that Chapple's charge of frivolousness is itself frivolous and argues that sanctions are inappropriate.

A court may impose sanctions under Rule 11 if a party submits a pleading or motion "for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." Kropelnicki v. Siegel, 290 F.3d 118, 131 (2d Cir. 2003) (internal quotations omitted). The standard for determining whether a party has violated Rule 11 is objective unreasonableness "and is not based on the subjective beliefs of the person making the statement." Storey v. Cello Holdings, LLC, 347 F.3d 370, 387 (2d Cir. 2003).

In contrast, 28 U.S.C. § 1927 works "to deter unnecessary delays in litigation." Oliveri v. Thompson, 803 F.2d 1265, 1273 (2d Cir. 1986) (internal quotations omitted). "An award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." Id. Unlike Rule 11, the imposition of sanctions under § 1927 requires "a clear showing of bad faith." Id.

The Court shares both parties' distaste for frivolous motion practice but sees no basis to impose the sanctions sought by plaintiff in this instance. Though the Court denies defendants' motion for partial summary judgment, it cannot say that the arguments submitted in support of that motion were objectively unreasonable with respect to Rule 11, or clearly demonstrative of bad faith, as required by § 1927. Indeed, with respect to the *quid pro quo* claim in particular, the Court has noted that the sufficiency of Chapple's evidence presents a close question. Plaintiff's motion for sanctions and costs is thus denied. See generally Laramee v. Jewish Guild for the Blind, 72 F. Supp. 2d 357, 362 (S.D.N.Y. 1999).

## IV.    PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

Chapple also moves to amend her complaint under Rule 15 to clarify certain allegations, add claims under NYCHRL, and add a fourth defendant, Fahnestock's CEO Albert Lowenthal. The motion papers attach a proposed first amended complaint ("PFAC") containing these changes. Defendants object only to the last of these proposed amendments, the addition of Lowenthal as a defendant, and the Court therefore grants Chapple leave to amend consistent with the PFAC as to all issues other than those related to the proposed addition of Lowenthal as a defendant. For the reasons that follow, Chapple's request to add Lowenthal as a defendant under Rule 15(c) is denied.

The Lowenthal amendment was sought in order to assert causes of action against him under NYSHRL and NYCHRL. Because the statute of limitations for both of these laws is three years, Antonmarchi v. Consol. Edison Co., No. 03-CV-7735, 2008 WL 4444609, at *16 n. 17 (S.D.N.Y. Sept. 29, 2008), and it is undisputed that the alleged conduct that gives rise to the proposed claims occurred in 2002, five years before Chapple's motion to amend was filed, the Lowenthal amendment is time-barred unless it "relates back," as defined in Rule 15(c), to the date of the original complaint. Rule 15(c)(1) permits an amendment to "relate back" to the original pleading when, *inter alia*:

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

In order for the plaintiff to avail herself of this rule and amend her complaint to add a defendant, the plaintiff thus must show that the proposed defendant originally would have been added "but for a mistake concerning the proper party's identity." FED. R. CIV. P. 15(c)(1)(C). "The Second Circuit has held that a 'mistake' in identifying a defendant occurs for purposes of Rule 15(c) when it is the result of 'misnomer or misidentification.'" Colombo v. S.C. Dep't of Soc. Servs., 221 F.R.D. 374, 376 (E.D.N.Y. 2004) (quoting Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 469-70 (2d Cir.1995)). Where a plaintiff does not allege she would have sued the proposed defendant in the original complaint but for a mistake in identity, the proposed amendment will not be said to relate back to the first pleading. Cornwell v. Robinson, 23 F.3d 694, 705 (2d Cir. 1994) (amendment to add defendants did not relate back where plaintiff knew

35

at the time of her original complaint the "identities of the . . . employees who she contended had harassed and discriminated against her;" plaintiff's failure to name defendants thus "must be considered a matter of choice, not mistake"). This is true even where the plaintiff was unaware of the identity of the proposed defendant at the time of the original filing. See Barrow, 66 F.3d at 470; Sidney v. Wilson, 228 F.R.D. 517, 520 (S.D.N.Y. 2005) (noting that amendment which "seek[s] to correct a lack of knowledge, rather than a mistake of fact or law" does not relate back under Rule 15(c)).

Chapple argues that her proposed addition of Lowenthal is proper under Rule 15(c) because she was unaware of Lowenthal's alleged role in her firing until November 2007 when Coakley submitted her affidavit revealing it. Chapple asserts that she, consequently, was "mistaken about the source of her termination" and is entitled to an amendment relating back to and correcting the original complaint. (Pl.'s Mem. in Opp. Summ. J. at 27.)

There are two impediments to granting this relief that are rooted in Chapple's very argument for relief. First, as defendants point out, Chapple's own submissions to the Court indicate that she did in fact possess at least some knowledge concerning Lowenthal's role in her termination at the time the event occurred. Chapple's handwritten notes for the date of her termination, August 19, 2002, state that "Eric Shames is finding a way in which he could have me fired from my job. He then finds a way to m[a]nipulate Bud Lowenthal -- President of Fahnestock." (Pl.'s Ex. 1 at 20-21.) Given this record, Chapple's argument that she was unaware that Lowenthal was involved in the termination until shortly before filing her motion for leave to amend, and therefore is not responsible for initially failing to sue him, is thoroughly unpersuasive. See Cornwell, 23 F.3d at 705.

Second, irrespective of what Chapple apparently knew at the time she filed her first complaint, her amendment to add Lowenthal does not relate back because the alleged "mistake" she asserts as justification is not of the kind contemplated by Rule 15(c) in any event. Specifically, Chapple does not claim that she was confused about the identity of the parties she originally sued. Colombo, 221 F.R.D. at 376; Pergo, Inc. v. Alloc, Inc., 262 F. Supp. 2d 122, 131 n. 7 (S.D.N.Y. 2003). Rather, at most, she "seek[s] to correct a lack of knowledge" as to the complete circumstances surrounding her termination and to do so by adding an additional culprit. Sidney, 228 F.R.D. at 520. Such an amendment does not relate back to the original claims which were complete claims made against other alleged culprits, and, therefore, the timeliness of the proposed amendment must be judged without the benefit of Rule 15(c). Id. Assuming, then, that there was any substance to the claim against Lowenthal personally,[7] without the relation back, it would be time-barred under both the state and municipal statutes authorizing such an action. Antonmarchi, 2008 WL 4444609, at *16 n. 17. For all of these reasons, this branch of plaintiff's motion to amend the complaint must be, and hereby is, denied.

## V.   CONCLUSION

For the reasons stated, defendants' motion for partial summary judgment as to Chapple's NYSHRL claims against Shames is denied, as is Chapple's motion for sanctions and costs. Chapple's motion for leave to amend the complaint is denied as to her proposed amendment to add Albert Lowenthal as a party defendant, but granted as to all other proposed amendments, as set forth in her PFAC.

---

[7]      The Court notes that the total absence of substantive allegations against Lowenthal in the PFAC further undermines plaintiff's request for leave to amend. Aside from the caption and a paragraph in the "Parties" section that merely identifies Lowenthal as the CEO of Fahnestock and a resident of New York, the PFAC does not otherwise mention Lowenthal at all or allege that he did anything. Thus, even if accepted, the PFAC plainly would be deficient in stating a claim for relief against him. See Deveer v. GEICO, No. 07-CV-4437, 2008 WL 4443260, at *7-8 (E.D.N.Y. Sept. 26, 2008) (denying leave to amend where proposed amended complaint referred to proposed defendant but twice and "fail to allege any wrongdoing whatsoever").

37

The Court directs plaintiff to serve by ECF on counsel for defendants her first amended complaint, as modified by this Memorandum and Order, no later than November 25, 2008. Defendants shall answer on or before December 8, 2008. Since the amendments assert no new factual contentions, no additional discovery will be permitted. The parties are directed to contact United States Magistrate Judge Joan M. Azrack to arrange for a pretrial conference to be calendared no later than January 9, 2009, in order to set a schedule for the prompt submission of a final joint pretrial order and for any other pretrial purposes deemed appropriate by the Magistrate Judge.

SO ORDERED.

Dated: Brooklyn, New York
November 17, 2008

ERIC N. VITALIANO
United States District Judge